**HIGH SIERRA HIKERS ASS'N,
et al., Plaintiffs,**

v.

**Bradley POWELL, et al., Defendants.**

No. C–00–01239–EDL.

United States District Court,
N.D. California.

June 5, 2001.

Julia A. Olson, San Francisco, CA, Peter M.K. Frost, Western Environment Law Center, Eugene, OK, for High Sierra Hikers Ass'n, Forest Service Employees for Environment Ethics and Wilderness Watch.

Richard A. Tamor, Oakland, CA, John E. Dicks, Gardnerville, NV, Donald R. Dinan, Sandeep Kathuri, Hall Estill Hardwick Gable Golden & Nelson, Washington, DC, for National Forest Recreation Ass'n, High Sierra Packers Ass'n, Yosemite Trails Pack Station, Minarets Pack Station, D&F Pack Station, High Sierra Pack Station, Mammoth Lakes Pack Outfit, McGee Creek Pack Station, Frontier Pack Trains, Reds/Agnew Meadows, Rock Crek Pack Station, Berners' Pack Outfits, Bishop Pack Outfitters, Cottonwood Pack Station, Glacier Pack Train, Rainbow Pack Outfitters.

James A. Coda, U.S. Attorney's Office, San Francisco, CA, for Jeffrey Bailey, James Boynton, Michael Dombeck, U.S. Forest Service, Bradley Powell.

ORDER DISMISSING AS MOOT PLAINTIFFS' CLAIMS UNDER THE NATIONAL FOREST MANAGEMENT ACT AND ONE OF PLAINTIFFS' CLAIMS UNDER THE WILDERNESS ACT; GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

LAPORTE, United States Magistrate Judge.

## I INTRODUCTION

On April 10, 2000, Plaintiffs High Sierra Hikers Association, et al. ("Plaintiffs")

filed this action for declaratory and injunctive relief against Defendants Bradley Powell, et al. ("Defendants"). The complaint alleges that Defendants violated the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600–1687, the Wilderness Act, 16 U.S.C. §§ 1131–1136, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370d and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706. Plaintiffs seek a declaration that Defendants have violated NFMA by violating the standards and directions set forth in the Inyo National Forest Land and Resource Management Plan ("LRMP") and the Sierra National Forest LRMP through their failure to perform nondiscretionary duties and through their affirmative action to allow commercial uses in the Forests that are inconsistent with wilderness values. Compl. at 15:9–13. Plaintiffs also seek a declaration that Defendants have violated the Wilderness Act by failing to determine whether current commercial uses of the John Muir and Ansel Adams Wilderness Areas are consistent with the Act. *Id.* at 15:19–21. In addition, Plaintiffs seek a declaration that Defendants have violated NEPA by failing to prepare an environmental analysis prior to issuing special use permits to commercial users. *Id.* at 15:27–16:3. Plaintiffs also seek injunctive relief compelling Defendants "to promptly adopt or implement all required standards for management of and allowed uses in the wilderness areas and to limit uses that are inconsistent with those standards." *Id.* at 2:20–22.

Plaintiffs are nonprofit entities dedicated to conservation, education and wilderness protection. Each organization has members who use the Ansel Adams and John Muir Wilderness Areas for various recreational activities. Defendants are the United States Forest Service itself and the Chief of the United States Forest Service as well as a Regional Forester and two Forest Supervisors. Intervenors, as Amici at this stage of the litigation, are packers who operate commercial pack stations in the Inyo and Sierra National Forests and the Ansel Adams and John Muir Wilderness Areas and their associations, the National Forest Recreation Association and the High Sierra Packers Association.[1]

On December 19, 2000, Defendants moved to dismiss or for summary judgment on the grounds that: (1) Plaintiffs' challenges to the Forest Service's management program for the two wilderness areas amounts to an impermissible programmatic challenge and (2) there is no final agency action from which Plaintiffs can obtain relief under the APA. Defendants also contend that some of Plaintiffs' claims are time-barred and others became moot upon issuance of the Final Environmental Impact Statement ("FEIS") and Record of Decision ("ROD").

On December 20, 2000, Plaintiffs moved for summary judgment, arguing that their claims are reviewable. Plaintiffs also seek declaratory relief that the Forest Service has: (1) violated NFMA by failing to implement or meet Forest and Wilderness Standards; (2) violated the Wilderness Act by failing to determine that commercial services are necessary and proper and by allowing services that degrade wilderness values; and (3) violated NEPA by failing to prepare environmental analyses before issuing special use permits and other instruments that allow commercial services to be performed in the wilderness areas.

---

1. In a July 24, 2000 Order, the Court granted Intervenors' Motion to Intervene with respect to the relief phase of this case, but denied the motion with respect to the merits phase. The Court permitted Intervenors to file an Amici brief in this stage of the litigation. For ease of reference, Intervenors will be referred to as Amici in this Order.

Both motions were timely opposed and each party filed a reply.[2] The Court permitted Defendants to file an additional response by February 16, 2001. Both parties have filed motions to strike evidence and argument. Amici filed a brief on February 6, 2001.

On March 13, 2001, the Court held a hearing on the Plaintiffs' Motion for Summary Judgment and Defendants' Motion to Dismiss or for Summary Judgment as well as the related Motions to Strike. All parties appeared through their counsel of record.

On April 20, 2001, just as the Court was preparing to issue this decision, the Forest Service issued the FEIS and ROD. Pursuant to the Court's April 24, 2001 Order, Plaintiffs and Defendants filed supplemental briefs addressing the effect of these documents on this case. Upon consideration of the parties' submissions, the arguments at the hearing, the relevant authorities and the record in this case and good cause appearing, the Court enters the following Order.

## II BACKGROUND FACTS

Two wilderness areas are at issue here. The John Muir Wilderness Area ("John Muir") was created in 1964 and initially encompassed approximately 502,000 acres. Administrative Record ("AR"), volume 1A at 886. In 1984, John Muir was enlarged by 81,000 acres. *Id.* at 16. The Ansel Adams Wilderness Area ("Ansel Adams"), formerly known as the Minarets Wilderness Area, consisted of approximately 109,559 acres when it was created in 1964. *Id.* at 974. In 1984, Ansel Adams was enlarged by 119,000 acres. *Id.* at 16. These two wilderness areas are located within the Inyo and Sierra National Forests; each National Forest contains some portion of each of the two wilderness areas. *Id.* at 886, 974.

In 1979, the Forest Service adopted a management plan for John Muir and Ansel Adams. AR, volume 1A at 882, 968. In 1988, the Forest Service adopted a Land and Resource Management Plan ("LRMP") for the Inyo National Forest. *Id.* at 1116. In 1992, the Forest Service adopted an LRMP for the Sierra National Forest. *Id.* at 1522. For both LRMPs, the Forest Service prepared environmental impact statements ("EIS") to evaluate the impacts of the LRMPs. *Id.* at 1096, 1452.

Both wildernesses issue permits to the public as well as to businesses that provide services to the visiting public. *See* AR, volume 1A at 130–31. Members of the public must obtain a "wilderness permit" from the Forest Service for an overnight visit. *See id.* at 130. The Forest Service limits the number of these wilderness permits by specific trailheads. *See id.* at 131. Some trailheads have daily quotas, which are determined by capacity limits for wilderness zones. *See id.*

Commercial outfitters and guides who operate commercial services must obtain a "special use permit." *See* AR, volume 1 at 778. These commercial users include operators with livestock. *See* AR, volume 1A at 31. The amount of wilderness use by the commercial users is dictated by their "service day allocations." *See id.* A "service day" equals one person being assisted by an outfitter or guide and using the wilderness for one day. *Id.*

---

**2.** In Defendants' Opposition to Plaintiffs' Motion for Summary Judgment, Defendants purport to bring a counter-motion for summary judgment to be heard on the same date as Plaintiffs' motion. Self-expedited counter- motions are no longer permitted by the Civil Local Rules. Therefore, the Court declines to address the Defendants' purported counter-motion.

In 1992, the Forest Service notified the public of its intent to prepare a revised management plan for the two wilderness areas. *See* AR, volume 1A at 483. In 1997, the Forest Service issued a draft environmental impact statement ("DEIS") proposing replacement of existing management direction in the LRMPs with new management plans for the Ansel Adams and John Muir Wildernesses. *Id.* at 472. In February 1999, the Forest Service announced that it would issue a revised DEIS ("RDEIS"), which it did in August 2000. *Id.* at 470.

On April 20, 2001, the Forest Service issued the FEIS, ROD and Wilderness Management Plan. In the ROD, the Forest Service decided to adopt a plan that "replaces the existing wilderness plans for the Ansel Adams (formerly Minarets), John Muir, and Dinkey Lakes Wildernesses and ... will mak[e] non-significant amendments to the LRMPs for the Sierra and Inyo National Forests." ROD, April 2001, at 1. Relevant to this case, the Wilderness Management Plan and ROD removed from the Inyo LRMP two Management Directions that Plaintiffs rely on in this lawsuit: (1) the direction to establish capacity limits for each wilderness and implement entry limits on specific trailheads to regulate use when use exceeds capacity; and (2) the direction to apply trailhead entry quotas to both commercial and noncommercial users. *See* AR, volume 1A at 1239; Wilderness Management Plan at 5; ROD at 31.

## III LEGAL STANDARDS

### A. Motion to Dismiss

"After the pleadings are closed, but within such time as not to delay the trial, any party may move for judgment on the pleadings." Fed.R.Civ.Proc. 12(c). A motion under this rule challenges the legal sufficiency of the parties' allegations. The standard applied on a Rule 12(c) motion is essentially the same as that applied to a Rule 12(b)(6) motion, i.e., even if all material facts in the pleading are true, the moving party is entitled to judgment as a matter of law. *See Hal Roach Studios v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir.1989). Judgment on the pleadings is not appropriate if the complaint raises issues of fact which, if proven, would support recovery. *See General Conference Corp. of Seventh–Day Adventists v. Seventh–Day Adventist Congregational Church*, 887 F.2d 228, 230–31 (9th Cir. 1989).

### B. Summary Judgment

Rule 56(c) of the Federal Rule of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material·fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* The court may not weigh the evidence. *See id.* at 255, 106 S.Ct. 2505. Rather, the nonmoving party's evidence must be believed and "all justifiable inferences must be drawn in [the nonmovant's] favor." *United ed Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir.1989) (en banc) (citing *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. 2505).

The moving party bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, deposi-

tions, interrogatory answers, admissions and affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the nonmoving party will bear the burden of proof at trial, the moving party's burden is discharged when it shows the court that there is an absence of evidence to support the nonmoving party's case. *See id.* at 325, 106 S.Ct. 2548.

A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of [that] party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. 2505. The opposing party, however, need not produce evidence in a form that would be admissible at trial in order to avoid a summary judgment. *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Nor must the opposing party show that the issue will be resolved conclusively in its favor. *See Liberty Lobby,* 477 U.S. at 248–49, 106 S.Ct. 2505. All that is necessary is sufficient evidence supporting the asserted factual dispute and requiring a jury or judge to resolve the parties' differing versions of the truth at trial. *See id.*

## C. Reviewability

### 1. Judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706

To establish a right to judicial review under the APA, a complaining party must satisfy two requirements: (1) that the party was affected by some "agency action" which will be the subject of judicial review and (2) that the party suffered legal wrong because of the agency action or was adversely affected by that action within the meaning of a relevant statute. *See* 5 U.S.C. § 702; *see also Lujan v. Nat'l*

*Wildlife Fed'n,* 497 U.S. 871, 882, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Under the APA, the reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed" and "hold unlawful and set aside agency action, findings, and conclusions found to be—arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. §§ 706(1), 706(2)(A). Therefore, to survive summary judgment based on claims brought under the APA, there must be a genuine factual dispute as to whether the Forest Service's decision was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law. 5 U.S.C. § 706(2).

"Agency action" is defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). Where review is not pursuant to authorization in the substantive statute but only under the APA, as with Plaintiffs' NFMA and Wilderness Act claims, the "agency action" must be "final agency action." 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.").

■ "Final agency actions" are actions which (1) "mark the consummation of the agency's decisionmaking process" and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear,* 520 U.S. 154, 178, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997); *Ecology Ctr., Inc. v. United States Forest Serv.,* 192 F.3d 922, 925 (9th Cir.1999). The final action must be "an identifiable action or event." *Lujan,* 497 U.S. at 899, 110 S.Ct. 3177. Absent a specific and final agency action, there is no jurisdiction to challenge agency conduct. *Lujan* makes clear that pro-

grammatic challenges are not permitted; a lawsuit must challenge a concrete agency action. *See Lujan,* 497 U.S. at 891, 110 S.Ct. 3177.

■ Even if an action is not a final agency action, the action could be judicially reviewable pursuant to 5 U.S.C. § 706(1) as a failure to act. That section permits review of claims to compel "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Under this limited exception to the finality rule, there has to be a *genuine* failure to act, rather than a complaint about the sufficiency of the action. *Ecology Ctr.,* 192 F.3d at 926.

### 2. Programmatic challenges under *Lujan v. National Wildlife Federation,* 497 U.S. 871 (1990).

■ Here, Defendants claim that Plaintiffs' complaint constitutes an impermissible programmatic challenge to the forest management plan, similar to *Lujan.* Defendants urge that Plaintiffs' claims impermissibly exceed specific challenges to discrete permit actions. Rather, Defendants argue, "Plaintiffs' attempt to claim some final agency action in this case with respect to the commercial users should not cloud the fact that plaintiffs are challenging the Forest Service's entire wilderness program for the John Muir and Ansel Adams Wilderness Areas." Defs.' Mot. for Summ.J. at 17:14–16. Plaintiffs counter that they have brought a series of specific legal challenges based on Defendants' clear violations of legal duties. *See* Pls.' Opp'n to Defs.' Mot. for Summ.J. at 12:10–11.

In *Lujan,* the plaintiffs alleged that the defendants violated the Federal Land Policy Act, NEPA and APA in the administration of the "land withdrawal review program" of the Bureau of Land Management ("BLM"), but failed to challenge any particular agency action that caused harm.

*See Lujan,* 497 U.S. at 875, 891, 110 S.Ct. 3177. The Court held that the "land withdrawal review program" was not an identifiable, much less final, agency action or series of such actions within the meaning of the APA, but rather a general label sweeping into its purview policies and practices as broad and multi-faceted as those of a "drug interdiction program" of the Drug Enforcement Agency. *See id.* at 890, 110 S.Ct. 3177 ("The term 'land withdrawal review program' (which as far as we know is not derived from any authoritative text) does not refer to a single BLM order or regulation, or even to a completed universe of particular BLM orders and regulations. It is simply the name by which [defendants] have occasionally referred to the continuing (and thus constantly changing) operations of the BLM in reviewing withdrawal revocation applications and the classifications of public lands and developing land use plans...."). Even though the plaintiffs alleged rampant violations of the law within the program, the Court found that the plaintiffs "cannot seek *wholesale* improvement of this program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." *Id.* at 891, 110 S.Ct. 3177 (emphasis in original).

Here, unlike in *Lujan,* Plaintiffs have alleged specific discrete agency actions taken by Defendants that have caused harm to Plaintiffs, rather than a challenge to the entirety of Defendants' wilderness plans. For example, Plaintiffs have challenged the calculation of certain trailhead limits and the grant of certain special use permits. *Cf. Lujan,* 497 U.S. at 892 n. 3, 110 S.Ct. 3177 (if and when requested mine permit is granted, "there is no doubt that agency action ripe for review will have occurred; nor any doubt that, in the course of an otherwise proper court challenge ... [plaintiffs] would be able to call

into question the validity of the classification order authorizing the permit. . . .")

Accordingly, the Court rejects Defendants' general objection to Plaintiffs' complaint as a non-reviewable programmatic challenge. The Court will therefore consider each agency action alleged by Plaintiffs individually on its own merits.

### D. Mootness

■ A case or controversy becomes moot when it " 'los[es] its character as a present, live controversy of the kind that must exist if [the court is] to avoid advisory opinions on abstract propositions of law.' " *Cantrell v. City of Long Beach*, 241 F.3d 674, 678 (9th Cir.2001) (citing *Hall v. Beals*, 396 U.S. 45, 48, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969)). To be justiciable, a controversy

> 'must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy, admitting of a specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'

*West v. Sec'y of Dep't of Transp.*, 206 F.3d 920, 924 (9th Cir.2000). Demonstrating mootness is a heavy burden. *See id.*

■ In determining mootness, the issue is not whether the specific relief sought in the complaint is still available, but whether there can be any meaningful relief. *See West*, 206 F.3d at 925; *Headwaters, Inc. v. Bureau of Land Mgmt.*, 893 F.2d 1012, 1015 (9th Cir.1989) ("case or controversy exists only when 'the challenged government activity . . . is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning parties.' ") (citing *Super Tire Eng'g Co. v. McCorkle,*

416 U.S. 115, 121, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974)).

■ Importantly for this case, however, "[l]ongstanding principles of mootness . . . prevent the maintenance of suit when 'there is no reasonable expectation that the wrong will be repeated,' " *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49, 66, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). In particular, a claim based on a governmental directive that has been superseded and "therefore has no current effect or continuing consequences" is moot. *See Western Radio Servs. Co. v. Glickman*, 113 F.3d 966, 974 (9th Cir. 1997).

■ An exception to the mootness rule applies when an issue is "capable of repetition yet evading review." *See Doe v. Madison Sch. Dist. No. 321*, 177 F.3d 789, 798 (9th Cir.1999). This exception is limited, however, to extraordinary cases in which (1) " 'the duration of the challenged action is too short to be fully litigated before it ceases,' and (2) 'there is a reasonable expectation that the plaintiffs will be subjected to the same action again.' " *Doe*, 177 F.3d at 798 (citing *American Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1124 (9th Cir.1997)). "It is sufficient, therefore, that the litigant show the existence of an immediate and definite governmental action or policy that has adversely affected and continues to affect a present interest." *Super Tire*, 416 U.S. at 125–26, 94 S.Ct. 1694; *see also Sosna v. Iowa*, 419 U.S. 393, 401, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975) (a challenge to state residency requirements for voting does not become moot simply because the plaintiff meets the residency requirement during the pendency of the action).

■ A defendant's voluntary cessation of the alleged unlawful conduct is another exception to the mootness doctrine

provided that "there is [a] reasonable expectation that the wrong will be repeated.'" *Doe,* 177 F.3d at 799 (citing *PUC v. FERC,* 100 F.3d 1451, 1460 (9th Cir.1996)). The burden of persuading the court that the challenged conduct cannot reasonably be expected to recur lies with the party asserting mootness. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.,* 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). The relevant inquiry under this exception is "whether the defendant is free to return to its illegal action at any time." *PUC,* 100 F.3d at 1460. In addition, for this exception to apply, the cessation of the unlawful conduct must have occurred because of the litigation. *See id.*

**E. Declaratory Relief**

■ "In a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). In determining whether a case or controversy exists for purposes of declaratory relief, the question is whether there is "a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant issuance of a declaratory judgment." *Maryland Cas. Co. v. Pac. Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941); *Super Tire,* 416 U.S. at 122, 94 S.Ct. 1694.

■ Relief under 28 U.S.C. § 2201 is discretionary. *Brillhart v. Excess Ins. Co. of America,* 316 U.S. 491, 494, 62 S.Ct. 1173, 86 L.Ed. 1620 (1942). A court cannot issue a declaratory judgment if a claim has become moot. *PUC v. FERC,* 100 F.3d 1451, 1459 (9th Cir.1996) (citing *United Pub. Workers of Am. v. Mitchell,* 330 U.S. 75, 89, 67 S.Ct. 556, 91 L.Ed. 754

(1947)); *Native Vill. of Noatak v. Blatchford,* 38 F.3d 1505, 1514 (9th Cir.1994).

**IV DISCUSSION**

**A. National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600–1687**

Plaintiffs claimed that Defendants violated the direction and standards contained in the LRMPs by failing to perform nondiscretionary duties and by affirmatively acting to permit commercial uses in the wilderness that destroy the wilderness. Specifically, Plaintiffs alleged that Defendants failed to adopt new management standards, failed to adopt capacity limits for each wilderness and all travel zones, failed to apply trailhead entry quotas all users, failed to include commercial stock use in quotas and failed to require commercial users to apply for permits.

NFMA creates a statutory framework for the management of national forests. Specifically, NFMA states that the Forest Service "shall develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System." 16 U.S.C. § 1604(a). NFMA provides a two-step process for forest planning. First, the Forest Service must develop a LRMP and an EIS for the entire forest. *See* 36 C.F.R. § 219.10(a), (b). Second, once the LRMP is in place, the Forest Service assesses site-specific projects in light of the LRMP. *See* 36 C.F.R. § 219.10(e); *Neighbors of Cuddy Mountain v. United States Forest Serv.,* 137 F.3d 1372, 1377 (9th Cir.1998). In this process, the Forest Service implements the LRMP by approving, with or without modification, or disapproving, particular site-specific projects to take place within the wilderness area.

The LRMP is "in essence, a programmatic statement of intent that establishes basic guidelines and sets forth the planning elements that will be employed by the

**1036**

Forest Service in future site-specific decisions." *Sierra Club v. Robertson,* 28 F.3d 753, 755 (8th Cir.1994). Among other items, an LRMP must provide for multiple use and sustained yield of the products and services obtained from that use, including outdoor recreation. *See* 16 U.S.C. § 1604(e). NFMA also provides for public participation in the development, review and revision of the LRMP. *See* 16 U.S.C. § 1604(d).

### 1. Failure to Adopt New Management Standards

█ Plaintiffs alleged that Defendants failed to act by failing to adopt new management standards for the Ansel Adams and John Muir Wilderness Areas as described in the Inyo LRMP. In the "Forest-wide standards and guidelines" section, the Inyo LRMP states,

> Develop management plans or amend existing plans to address wilderness designated by the California Wilderness Act of 1984 or any wilderness legislation enacted during the planning period. Manage wilderness under the following guidelines: maintain a predominantly neutral and natural-appearing environment, facilitate low frequencies of interaction between users, and exercise necessary controls primarily from outside the wilderness boundary. Any on-site controls should be subtle.

AR, volume 1A at 1225. These "standards and guidelines" set forth the "minimum resource conditions that will be maintained throughout the Forest" and "provide specific guidelines for the management of each resource to ensure its protection or enhancement." *Id.* at 1202. The plain language of these standards and guidelines indicates that they are mandatory, rather than discretionary.

Plaintiffs are understandably frustrated by the Forest Service's slow pace in formulating and adopting a new management plan in accordance with this guideline and standard. Although the Inyo LRMP provides generally for revisions every ten to fifteen years (AR, volume 1A at 1124), and provides specifically for revision to address additional wilderness designated by the 1984 statute, thirteen years elapsed since adoption of the Inyo LRMP in 1988 before the agency adopted new wilderness plans for the John Muir and Ansel Adams Wildernesses in April 2001.

Although the delay has been quite lengthy, now there has been final agency action. The fact that Defendants have now adopted a Wilderness Management Plan, however, raises the question of mootness. To the extent that Plaintiffs seek injunctive relief for this alleged violation, that relief is not available from the Court since Defendants have already adopted the Wilderness Management Plan. No alternative injunctive relief will redress the damages caused by the failure to adopt new management standards. Therefore, Plaintiffs' injunctive relief claim for this alleged violation is moot.

Plaintiffs also seek declaratory relief for this alleged violation. The challenged activity—failure to adopt new management plans—does not constitute a case or controversy for purposes of declaratory relief in light of the issuance of the new Wilderness Management Plan. *See Super Tire,* 416 U.S. at 122–23, 94 S.Ct. 1694 (where challenged government action has ceased or repetition of the action is remote, the action is moot).

No exception to the mootness doctrine applies. Since new management standards have been adopted, there is no reasonable expectation that this government action will be repeated. Therefore, Plaintiffs' claim for declaratory relief on this issue is moot. Accordingly, Plaintiffs' claim for failure to adopt new management standards is dismissed as moot.

## 2. Failure to Adopt Capacity Limits for Each Wilderness and for All Travel Zones Within the John Muir Wilderness

Plaintiffs based their claim that Defendants violated NFMA by failing to adopt capacity limits on two former provisions contained in the Inyo LRMP and the John Muir Wilderness Plan. First, the Inyo LRMP stated in the "Management Prescriptions" section that the Forest Service must "[e]stablish capacity limits for each wilderness and implement entry limits on specific trailheads to regulate use when use exceeds capacity." AR, volume 1A at 1239. Second, the 1979 John Muir Wilderness Plan contained a management direction to "[d]etermine capacity limits for all travel zones of the John Muir Wilderness utilizing the Bishop Creek Study method." *Id.* at 901.

In opposition to Plaintiffs' claim, Defendants primarily argued that their actions did not constitute a complete failure to act and so were not reviewable. While Defendants had failed to adopt capacity limits for the Ansel Adams and John Muir Wilderness Areas as a whole or to establish limits for all travel zones within the John Muir, and may not have used the Bishop Creek Study method where they did establish such limits, Defendants did set many trailhead and travel zone limits. Therefore, this claim was similar to the issue of the Forest Service's partial compliance with its monitoring duties under another National Forest plan, which the Ninth Circuit found not reviewable. *See Ecology Ctr.*, 192 F.3d at 926.

In any event, Plaintiffs' challenge on this issue is now moot. Plaintiffs rely on provisions of the Inyo LRMP and the John Muir Wilderness Plan that have been eliminated by the new Wilderness Management Plan and ROD. *See* Wilderness Management Plan, April 2001, at 5; *see also* ROD, April 2001, at 31. Further, the pro-

visions on which Plaintiffs rest their claim for injunctive and declaratory relief have no current effect or continuing consequences. *See Western Radio Servs.*, 113 F.3d at 974 (plaintiffs' claim based on letter directive by Forest Service official that temporarily eliminated multiple user special use permits was rendered moot by superseding published fee schedule authorizing such multiple user permits).

No exception to the mootness doctrine applies here. Since the provisions on which Plaintiffs rely are no longer operative, violations of those provisions are not reasonably likely to recur. In addition, this claim fails the first requirement of the "capable of repetition yet evading review" exception because the challenged action was not of a short duration. *See Sosna*, 419 U.S. at 401, 95 S.Ct. 553. Plaintiffs themselves state that Defendants have not complied with this standard for twenty-one years. *See* Pls.' Supp.Br. dated May 8, 2001 at 2:7–11.

The voluntary cessation exception does not apply either because Defendants are not free to return to their allegedly unlawful conduct. The provisions with which Defendants allegedly failed to comply no longer exist. Thus, even if Defendants continued the conduct that Plaintiffs challenge, that conduct could no longer be said to violate any Forest Service regulation. Further, there is no reasonable expectation that the wrong will be repeated. The conduct is no longer unlawful. Furthermore, the ROD states that the Forest Service "will conduct an evaluation of the Plan in 5 years." ROD, April 2001, at 21. Accordingly, Plaintiffs' claim for failure to adopt capacity limits is dismissed as moot.

## 3. Failure to Apply Trailhead Entry Quotas to all Users

Plaintiffs alleged that Defendants took reviewable final agency action with regard

to the former requirement in the Inyo LRMP to "[a]pply trailhead entry quotas to both commercial and noncommercial users" (AR, volume 1A at 1239), and failed to comply. Defendants responded that they took action and complied with this requirement by accounting for commercial uses through a calculation as well as through the service day allocation system.

The provision of the Inyo LRMP on which Plaintiffs rely has been specifically eliminated by the new Wilderness Management Plan and ROD. *See* Wilderness Management Plan, April 2001, at 5; *see also* ROD, April 2001, at 31. Even so, detailed quotas for all users are set forth in the ROD and the Wilderness Management Plan. *See* Wilderness Management Plan, April 2001 at 41–43; ROD, April 2001, at 9–12. Further, the provision on which Plaintiffs rest their claim for injunctive and declaratory relief has no current effect or continuing consequences. *See Western Radio Servs.*, 113 F.3d at 974. Plaintiffs' challenge on this issue is moot.

For the same reasons as stated in section IV.A.2. above, no exception to the mootness doctrine applies here. Accordingly, Plaintiffs' claim for failure to apply trailhead quotas to all users is dismissed as moot.

### 4. Failure to Include Commercial Stock Use in Quotas

Plaintiffs contended that Defendants failed to include commercial livestock in calculating the trailhead quotas as required by the John Muir Plan. Defendants contended, relying on the Bramlette declaration, that commercial stock use was incorporated into trailhead quotas. *See* Declaration of William Bramlette at ¶¶ 24–25.[3]

If Plaintiffs are correct that Defendants failed to include stock use, then the action is reviewable as a failure to act. Even if the Court were to accept Defendants' citation to the Bramlette declaration as admissible evidence that commercial stock use was incorporated into quotas, the action would be reviewable as a final agency action.

This claim, however, has become moot. It rests on a management direction in the former John Muir Plan: "[i]nclude present levels of commercial stock use as part of the quota when establishing trailhead limits." AR, volume 1A at 900. The accomplishment date for this direction was "ongoing." *Id.* The John Muir Wilderness Plan has been completely superceded, however, by the new Wilderness Management Plan and ROD. *See* Wilderness Management Plan, April 2001, at 5; *see also* ROD, April 2001, at 30. The new Wilderness Management Plan sets forth specific trailhead quotas. *See* ROD, April 2001 at 2; 9–12; Wilderness Management Plan at 18–21; 41–43. Further, the provision on which Plaintiffs rest their claim for injunctive and declaratory relief has no current effect or continuing consequences. *See Western Radio Servs.*, 113 F.3d at 974.

For the same reasons as stated above in section IV.A.2. above, no exception to the mootness doctrine applies here. Accordingly, Plaintiffs' claim for failure to include commercial stock use in quotas is dismissed as moot.

### 5. Failure to Require Commercial Users to Apply for Permits

Plaintiffs contended that Defendants engaged in final agency action by issuing special use permits and service day alloca-

---

**3.** Defendants submitted the Bramlette declaration with their Opposition to Plaintiffs' Motion for Summary Judgment in part to explain their efforts to apply trailhead quotas to all users and to include commercial stock use in quotas. The Bramlette declaration is inadmissible to contradict Defendants' responses to Plaintiffs' requests for admissions. *See* Fed.R.Civ.Proc. 36(b).

tions to commercial users without requiring them to apply for wilderness permits, in violation of the former John Muir Plan. Defendants responded that the Plan did not require commercial users to obtain wilderness permits. The former John Muir Plan stated: "[t]he commercial user is generally directed away from the heavily visited areas. If they are permitted to utilize areas with visitor limits they must apply along with the general public for a Wilderness permit." AR, volume 1A at 895. This statement appeared in the "Situation and Analysis" section of the Plan and did not appear to be mandatory. *See id.* at 894. Since Defendants issued special use permits to commercial users without application for a wilderness permit, there has been reviewable final agency action.

The Wilderness Management Plan and the ROD, however, supercede the John Muir Plan and set forth a new permit system for commercial users. *See* Wilderness Management Plan, April 2001, at 18–19; ROD, April 2001, at 2–3. Under the new Wilderness Management Plan, all commercial and non-commercial users must apply to the Forest Service for permits. *See* ROD, April 2001 at 2–3; 12–13; Wilderness Management Plan, April 2001 at 18; 27. Further, the provision on which Plaintiffs rest their claim for injunctive and declaratory relief has no current effect or continuing consequences. *See Western Radio Servs.,* 113 F.3d at 974.

For the same reasons as stated above in section IV.A.2. above, no exception to the mootness doctrine applies. Accordingly, Plaintiffs' claim for failure to require commercial users to apply for permits is dismissed as moot.

**B. Wilderness Act, 16 U.S.C. §§ 1131 – 1136**

Plaintiffs alleged that Defendants violated the Wilderness Act by issuing special use permits to commercial users without determining whether such commercial uses were necessary and proper and by allowing commercial uses that degrade the wilderness. Congress enacted the Wilderness Act "to assure that an increasing population, accompanied by expanding settlement and growing mechanization, does not occupy and modify all areas within the United States and its possessions, leaving no lands designated for preservation and protection in their natural condition." 16 U.S.C. § 1131(a). The Act established a National Wilderness Preservation System composed of "wilderness areas" which "shall be administered for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness...." *Id.* The Act defines wilderness "in contrast with those areas where man and his own works dominate the landscape, ... as an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain." 16 U.S.C. § 1131(c). The purposes of the Wilderness Act supplement the purposes for which national forests are established and administered. *See* 16 U.S.C. § 1133(a).

Under the Wilderness Act, an agency charged with administering a designated wilderness area is responsible for preserving its wilderness character. *See* 16 U.S.C. § 1133(b). Wilderness areas must be "devoted to the public purposes of recreational, scenic, scientific, educational, conservation and historical use." 16 U.S.C. § 1133(b). Subject to existing private rights, commercial enterprises are not permitted in a wilderness area except as necessary for administration of the area. *See* 16 U.S.C. § 1133(c). Commercial services may only be performed within the wilderness areas "to the extent necessary for activities which are proper for realizing

the recreational or other wilderness purposes of the area." 16 U.S.C. § 1133(d)(5).

Plaintiffs argued that Defendants violated the Wilderness Act by issuing special use permits that fail to limit the extent of stockpacking services to that necessary for recreation in the wilderness and that permit large pack groups that spoil the pristine wilderness environment and improperly cause signs of man to dominate. For example, a wilderness manager for the John Muir and Ansel Adams Wilderness Areas described creation of unauthorized stock trails, stream bank erosion, increased campsite size and system trail impacts caused by large pack groups. *See* Declaration of Julia Olson ("Olson Decl.") Ex. A. at 33:17–25, 82:23–83:24. Members of the public have complained about an increase in dust, manure in campsites due to the pack groups, and the loss of solitude. *See* AR, volume 3 at 356, 1003–04; *see also* Olson Decl.Ex. A. at 94:25–95:10. The administrative record contains additional examples of negative impacts of large pack groups on meadows, trees, vegetation, soils and fragile wildlife, as well as heavy trampling, overgrazing and erosion of trails. *See* AR, volume 3 at 95, 587, 883–84, 1166, 1203, 1779–80. Lastly, Plaintiffs argue that the Forest Service has failed to restore the wilderness character in the degraded areas as required by the regulations. *See* 36 C.F.R. § 293.2. This evidence of environmental degradation raises serious concerns.

Defendants argued that Plaintiffs' claims under the Wilderness Act were not reviewable because there had been no final agency action and no failure to act as required under the APA. Defendants further responded that they have broad discretion under the Act to allow commercial stock trips to further the public's "use and enjoyment" of the wilderness areas. Amici similarly argued that stock services may aid families with small children, the disabled and the elderly to enjoy the backcountry.

Most importantly, Defendants point out that the FEIS contains an analysis of the need for stock services and concludes that some use is necessary for the public's enjoyment. At the same time, the FEIS adopts a new approach intended to limit adverse impacts from stock use. *See, e g.,* AR, volume 1 at 58, 140, 479, 917; *See* FEIS at App. D. Defendants argue that the Needs Assessment included in the FEIS moots Plaintiffs' Wilderness Act claims that relate to the necessity of commercial services in the wilderness.

To the extent that Plaintiffs seek injunctive relief to redress this alleged violation of the Wilderness Act, the claim is moot since Defendants have actually completed a Needs Assessment. Plaintiffs argued that the Needs Assessment is inadequate in that it fails to consider in any detail the extent of the need for such commercial services, and the precise types of such services (e.g., smaller pack groups, lightweight equipment, etc.) that are needed. The Wilderness Act is framed in very general terms and does not specify any particular form or content for such an assessment. Since the claim is moot, the Court cannot grant declaratory relief. Further, the new Wilderness Management Plan is intended to address the competing concerns of the various parties. And the requirement that the Forest Service complete environmental assessments and/or impact analyses for special use permits issued to commercial packers, as set forth below, should flesh out the details that are missing from the Needs Assessment. Therefore, Plaintiffs' claim under the Wilderness Act that Defendants failed to determine whether commercial uses were necessary is dismissed as moot.

Plaintiffs also claim that Defendants permitted commercial uses that degrad-

ed the wilderness in violation of the Wilderness Act. Plaintiffs, however, cite no authority concluding that such conduct violates the Wilderness Act. Defendants argue that the Forest Service is committed to protecting the wilderness to the extent that it can, given its constrained resources and packers who do not always comply with the wilderness rules. Defendants state that they are simply permitting the public and packers to continue their historical use of the wilderness and that their decisions regarding acceptable commercial uses in the wilderness are entitled to broad discretion. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 844–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Kelly v. United States,* 241 F.3d 755, 760–61 (9th Cir.2001).

While Plaintiffs' evidence of environmental degradation is disturbing, it does not rise to the level of showing that the Forest Service abused its broad discretion under the very general requirements of the Wilderness Act. Accordingly, Plaintiffs' Motion for Summary Judgment for the claim that Defendants violated the Wilderness Act by permitting commercial uses that degraded the wilderness is denied. Defendants' Motion for Summary Judgment on this issue is granted.

4. On March 19, 2001, in response to Plaintiffs' request at the hearing, the Court issued an order permitting Plaintiffs to file a supplemental complaint addressing the issuance and renewal of additional special use permits from the date of the complaint through the date of the March 13, 2001 hearing. On March 27, 2001, Plaintiffs filed their supplemental complaint, erroneously captioned "first amended complaint." On April 3, 2001, Defendants filed their supplemental answer. In addition, Defendants filed a supplemental administrative record relating to those additional special use permits.

## C. National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 – 4370d

■■■■ Plaintiffs challenge Defendants' failure to prepare an environmental assessment ("EA") or EIS prior to issuing multi-year Special Use Permits ("SUP") to the commercial packers in the first instance and again prior to granting one-year renewals on permits that expired in 1999 and thereafter.[4] Specifically, Plaintiffs point out that the Forest Service has issued numerous SUPs and amendments to SUPs, for most of which the Forest Service never prepared an EA. *See* Pls.' Mot. for Summ.J. at 22 n. 13 & n. 15; *see also* AR, volume 1 at 285, 404, 411, 448, 657, 778, 886, 981, 1025, 1080, 1171, 1905, 2474, 2728, 2814, 2821, 2868, 3015, 3398, 3538, 3606, 3687, 3708; Supp. AR at 2A, 6, 7, 141, 192, 289, 362, 473A, 474, 661, 824, 925. It is undisputed that the Inyo National Forest did not prepare EAs or EISs prior to issuing amendments to the SUPs and the bulk of the new SUPs, and the Sierra National Forest similarly failed to do so with respect to all but two permits.[5] *See* Pls.' Reply to Defs.' Opp'n to Pls.' Mot. for Summ.J. at 19; *see also* Defs.' Opp'n to Pls.' Mot. for Summ.J. at 18–21.

■■■■ NEPA requires the Forest Service to prepare a detailed EIS for all "major Federal actions significantly affecting the quality of the human environment."[6] 42 U.S.C. § 4332(2)(C). NEPA

5. The Supplemental Administrative Record contains an EA for Issuance of a New Permit to Mammoth Lakes Pack Outfit. *See* Supp. AR at 1029. This document is undated and it is unclear whether it corresponds to an existing SUP in the record. Plaintiffs do not challenge these two environmental assessments completed for permits in the Sierra National Forest. *See* Pls.' Reply to Defs.' Opp'n to Pls.' Mot. for Summ.J. at 19, n. 7.

6. As a preliminary step, an agency may prepare an EA to determine whether the environmental impact of a proposed action is significant enough to warrant an EIS. See 40 C.F.R. 1508.9. An EA is a "concise public docu-

"ensures that the agency ... will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger [public] audience." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989)). In determining the scope of an EIS, an agency must consider, among other things, the cumulative impact of "individually minor but collectively significant actions taking place over a period of time." *Alpine Lakes Prot. Soc'y v. United States Forest Serv.*, 838 F.Supp. 478, 481–83 (W.D.Wash. 1993); 40 C.F.R. § 1508.25; 40 C.F.R. § 1508.7. The failure to consider the potential for the cumulative impact of actions on the environment cannot be characterized as an informed exercise of discretion. *See Alpine Lakes*, 838 F.Supp. at 484.

■ Although NEPA only applies when the agency is contemplating a major Federal action significantly affecting the environment (*see, e.g., Foundation for North Am. Wild Sheep v. United States Dep't of Agric.*, 681 F.2d 1172 (9th Cir. 1982)), Defendants conceded in their papers and at oral argument that NEPA applies to the issuance and renewal of the SUPs at issue here. *See* Defs.' Opp'n to Pls.' Mot. for Summ.J. at 18–19, 25. At the hearing, Defendants acknowledged that the Forest Service intends to comply with NEPA.

■ An agency's decision not to prepare an EIS under NEPA or to apply a categorical exclusion is reviewed under the arbitrary and capricious standard. *See Greenpeace Action v. Franklin*, 14 F.3d 1324, 1331 (1992). To ensure that the agency has taken the requisite "hard look" at the environmental consequences of its proposed action, a court must carefully review the record to determine whether the agency decision is "founded on a reasoned evaluation of the relevant factors." *Id.* at 1332. If the court is satisfied that the agency's decision is fully informed, the court must defer to that informed discretion. *See id.*

Here, Defendants essentially admit that they failed to comply with NEPA with respect to many of the permits and acknowledge that they did not prepare either EAs or EISs as required prior to the issuance of the multi-year SUPs. *See* Defs.' Opp'n to Pls.' Mot. for Summ.J. at 19. Rather, Defendants state that they intend to comply with NEPA with respect to future permit renewals after they complete the process of deciding whether to issue new wilderness plans. *See id.* Further, they defend the recent one-year extensions of the SUPs as falling within a categorical exclusion. These arguments on the merits are addressed below.

Although Defendants concede that this claim challenges final agency actions, (*see* Defs.' Opp'n to Pls.' Mot. for Summ.J. at 17), they fall back on their overarching argument that the Plaintiffs' challenge under NEPA is an impermissible programmatic challenge. To the contrary, Defen-

---

ment" that "briefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact (FONSI)." 40 C.F.R. § 1508.9(a)(1). If the agency issues a FONSI, no EIS is required. In some cases, an agency can utilize a categorical exclusion, in which case neither an

EIS nor an EA is required. A "categorical exclusion" is a "category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect in procedures adopted by a Federal agency in implementation of these regulations." 40 C.F.R. 1508.4.

dants' actions in issuing and renewing the SUPs constitute reviewable final agency actions. Accordingly, Defendants' Motion to Dismiss this claim is denied.

### 1. Failure to Prepare an EIS Prior to Issuing Multi–Year Special Use Permits

■ It is undisputed that Defendants did not prepare an EA or an EIS prior to issuing the vast majority of multi-year SUPs. As Defendants conceded at the hearing, issuance of these multi-year SUPs was a major Federal action that triggered the Forest Service's NEPA obligations. At a minimum, the Forest Service was obligated to prepare an EA, and it seems likely that an EIS would be required in light of the cumulative impacts of the numerous permits. *See Alpine Lakes,* 838 F.Supp. at 481–83; 40 C.F.R. § 1508.25; 40 C.F.R. § 1508.7. Defendants' excuse that they have been concentrating their efforts on preparing new wilderness plans rather than on preparing an EIS is unavailing.

Therefore, Plaintiffs' Motion for Summary Judgment on this issue is granted. Defendants' Motion for Summary Judgment on this issue is denied.

### 2. One–Year Renewals of Special Use Permits

■ In issuing the one-year renewals to SUPs, the Forest Service relied on the categorical exclusion in its regulations that provides: "approval, modification or continuation of minor short-term (one-year or less) special uses of National Forest land are categorically excluded" from NEPA review. *Alaska Ctr. for the Env't v. United States Forest Serv.,* 189 F.3d 851, 854 (9th Cir.1999) (citing Forest Service Handbook 1909.15, 30.3(1)(a)–(b)); Declaration of Peter Frost ("Frost Decl.") Ex. B at 6. The Forest Service Handbook cites three examples of categories of actions that normally do not have a significant impact on

the environment and therefore may be categorically excluded from the requirement of an EA or EIS: (1) "[a]pproving, on an annual basis, the intermittent use and occupancy by State-licensed outfitter or guide," (2) "[a]pproving the use of National Forest System land for apiaries;" and (3) "[a]pproving the gathering of forest products for personal use." Frost Decl.Ex. B at 6–7.

■ An agency's interpretation of the meaning of its categorical exclusion should be given controlling weight unless plainly erroneous or inconsistent with the terms used in the regulation. *See Alaska Ctr.,* 189 F.3d at 857. If a proposed action fits within a categorical exclusion, NEPA review is not necessary unless there are "extraordinary circumstances" related to the proposed action. *See id.* at 858. Extraordinary circumstances occur when an action that would otherwise be subject to a categorical exclusion may have significant environmental effects. *See id.* The agency must use the scoping process to canvas internal and external interested parties to find out whether the proposed action raises significant issues. *See id.; see also* Frost Decl. at Ex. B at 3. The Forest Service conducts "scoping for all proposed actions, including those that would appear to be categorically excluded." Frost Decl. Ex. B at 3. If extraordinary circumstances are revealed through scoping, then the Forest Service prepares an EA or EIS. *See id.*

Plaintiffs allege that the Forest Service violated NEPA by extending the SUPs for one year under an inapplicable categorical exclusion for "approval, modification, or continuation of minor, short-term (one year or less)" special uses of forest land. Frost Decl.Ex. B at 6. As demonstrated by its plain language and the examples provided, the categorical exclusion only applies to renewals of one-year or shorter

permits, not to renewals of multi-year permits as here.

Furthermore, Plaintiffs correctly note that the agency's own NEPA regulations do not permit the categorical exclusion of activities in wilderness areas. Specifically, the Forest Service policy states that a categorical exclusion cannot be used if extraordinary circumstances exist and defines such circumstances as including "[c]ongressionally designated areas, such as *wilderness,* wilderness study areas, or National Recreation Areas." *See* Frost Decl.Ex B. at 3 (emphasis added). By not preparing an EA or EIS when issuing these SUPs with categorical exclusions, the Forest Service violated not only NEPA but its own policies as well. *See West v. Sec'y of Dep't of Transp.,* 206 F.3d 920 (9th Cir.2000) (EA required where agency improperly relied on inapplicable categorical exclusion in violation of its own regulations).

■ Defendants also make an estoppel argument based on the agreement by a representative of Wilderness Watch, one of the Plaintiff organizations, that using categorical exclusions to extend permits for one year was preferable to using EAs in light of the expected completion of the wilderness plans. *See* Declaration of Glen Stein at ¶ 2. Defendants contend that they completed the requisite scoping by internally contacting relevant authorities as well as contacting external entities such as Plaintiff High Sierra Hikers, as indicated in their decisions. *See* AR, volume 1 at 434, 2865, 3528, 3648. Defendants' estoppel argument is not persuasive.

■ The elements of equitable estoppel are: "(1) the party to be estopped knows the facts, (2) he or she intends that his or her conduct will be acted on or must so act that the party invoking estoppel has a right to believe it is so intended, (3) the party invoking estoppel must be ignorant of the true facts, and (4) he or she must

detrimentally rely on the former's conduct." *See Lehman v. United States,* 154 F.3d 1010, 1016 (9th Cir.1998). As to the first element, Defendants have not established that the representative of Wilderness Watch spoke for his organization, much less for the other Plaintiffs in this lawsuit. Nor have Defendants met the third element. The Forest Service was not ignorant of the true facts, that is, the Forest Service knew of the requirements of NEPA and cannot base their failure to comply with those obligations on the opinion of a lay person.

Although deference to the Forest Service's interpretation of its rules is appropriate, this interpretation is plainly erroneous and inconsistent with the terms used. The Handbook states that the categorical exclusion applies to short term permits, not the multi-year permits that Defendants extended. Defendants have violated NEPA. Indeed, Defendants conceded in their submissions to the Court as well as in the March 13, 2001 hearing that they have not complied with NEPA. *See* Defs' Opp'n to Pls' Mot. for Summ.J. at 19:14–16.

Accordingly, Plaintiffs' Motion for Summary Judgment on this issue is granted. Defendants' Motion for Summary Judgment on this issue is denied.

## V PLAINTIFFS' MOTIONS TO STRIKE

### A. Motion to Strike Extra–Record Evidence Contained in Bramlette and Boynton Declarations

Plaintiffs seek to strike entirely the extra-record evidence contained in the Bramlette and Boynton declarations submitted by Defendants with their Opposition to Plaintiffs' Motion for Summary Judgment. In light of the Court's conclusion that Plaintiffs' claims under NFMA and one of Plaintiffs' claims under the Wilderness Act

are moot, the Court need not consider Plaintiffs' Motion to Strike.

### B. Motion to Strike Extra–Record Evidence in Amici Brief

■ In their response to the Amici brief, Plaintiffs seek to strike extra-record evidence contained in the amici brief. As an initial matter, Plaintiffs' Motion to Strike is not in compliance with the Civil Local Rules. *See* Civil L.R. 7–1(a)(1); 7–2. However, the Court intended to raise this issue sua sponte.

In accordance with Ninth Circuit precedent, on July 24, 2000, the Court granted Amici's motion to intervene with respect to the relief phase of this case, but denied the motion to intervene with respect to the merits phase of the litigation. July 24, 2000 order at 8:13–15. Also in that order, the Court granted Amici's request to file an amici brief with respect to the merits phase of the case. *Id.* at 8:15–17. At this stage, Amici are not parties and cannot introduce evidence. To permit Amici to submit evidence would undermine the Court's July 24, 2000 order. Accordingly, the extra-record evidence submitted by Amici is excluded. *See Metcalf v. Daley,* 214 F.3d 1135, 1141, n. 1 (9th Cir.2000).

## VI DEFENDANTS' MOTIONS TO STRIKE

### A. Motion to Strike Extra–Record Evidence

■ Defendants seek to strike extra-record evidence submitted by Plaintiffs. Defendants' Motion to Strike Extra–Record Evidence is granted to the extent that the declarations are inadmissible in connection with the final agency action claims unless they are explanatory of those actions. *See Kunaknana v. Clark,* 742 F.2d 1145, 1149 (9th Cir.1984) ("additional information should be explanatory in nature, rather than a new rationalization of the agency's decision and must be sustained by

the record."); *Asarco, Inc. v. EPA,* 616 F.2d 1153, 1158–59 (9th Cir.1980) ("A satisfactory explanation of agency action is essential for adequate judicial review, because the focus of judicial review is not on the wisdom of the agency's decision, but on whether the process employed by the agency to reach its decision took into consideration all the relevant factors."). Defendants' Motion to Strike is denied to the extent the declarations are admissible in connection with the failure to act claims. *See Friends of the Clearwater v. Dombeck,* 222 F.3d 552, 560 (9th Cir.2000) (challenge to agency's failure to act "is not limited to the record as it existed at any single point in time, because there is no final agency action to demarcate the limits of the record").

### B. Motion to Strike Post–Complaint Evidence and New Argument in Plaintiffs' Reply Brief

■ In a second motion to strike, Defendants sought to strike: (1) all evidence and briefing with respect to the one-year extensions of the eight term permits because decisions regarding those permits had not been made until after the complaint was filed; and (2) new argument that Plaintiffs made in their reply brief. At the March 13, 2001 hearing and in a subsequent order filed on March 19, 2001, however, the Court allowed Plaintiffs to supplement the complaint to include all special use permits issued or renewed from the date of Plaintiffs' complaint through the date of the hearing. A supplemental complaint is appropriate to bring the action up to date regarding relevant facts that occurred after the original complaint was filed. *See* Fed.R.Civ.Proc. 15(d); *Keith v. Volpe,* 858 F.2d 467, 476 (9th Cir.1988); *Manning v. City of Auburn,* 953 F.2d 1355, 1359–60 (11th Cir. 1992). The Court also ordered supplementation of the administrative record to con-

form to the new SUPs. In addition, the Court permitted Defendants to file a supplemental answer and brief in response to arguments made by Plaintiffs in their reply brief. Plaintiffs were permitted to file a one-page response to Defendants' brief. Accordingly, Defendants' Motion to Strike is denied.

## VII CONCLUSION

Plaintiffs' claims under NFMA and Plaintiffs' claim under the Wilderness Act that Defendants failed to determine the necessity of commercial uses are dismissed as moot. Plaintiffs' Motion for Summary Judgment (docket number 57) is granted with respect to the claims under NEPA and denied in all other respects. Defendants' Motion for Summary Judgment (docket number 55) is granted with respect to Plaintiffs' claim under the Wilderness Act that Defendants permitted commercial uses that degraded the wilderness. In all other respects, Defendants' Motion for Summary Judgment is denied.

In light of the mootness finding, the Court need not address Plaintiffs' Motion to Strike Extra–Record Evidence (docket number 70). The extra-record evidence submitted with the Amici brief is excluded. Defendants' Motion to Strike Extra–Record Evidence (docket number 97) is granted in part and denied in part. Defendants' Motion to Strike Post–Complaint Evidence and Argument (docket number 100) is denied. This Order also disposes of docket number 63 (Defendants' Counter–Motion for Summary Judgment).

IT IS SO ORDERED.